UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

KARL ESCHELBACH,                                  :

                              Plaintiff,          :       **OPINION AND ORDER**

          -against-                               :       01 Civ. 1778 (FM)

CCF CHARTERHOUSE/CREDIT                            :
COMMERCIAL DE FRANCE n/k/a
HSBC/CREDIT COMMERCIAL                             :
DE FRANCE
                              Defendant.           :

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.      Introduction

          In this wrongful termination suit, plaintiff Karl Eschelbach ("Eschelbach")

alleges that his former employer, CCF Charterhouse/Credit Commercial de France, now

known as HSBC/Credit Commercial de France ("CCF"), breached the terms of its

employment agreement with him in violation of common law contract principles, the New

York State Labor Law, and French law.  Eschelbach further contends that CCF

discriminated against him based on his national origin in violation of the New York State

Human Rights Law, N.Y. Exec. Law § 296, and the New York City Human Rights Law,

N.Y.C. Admin. Code § 8-101, et seq.  CCF has now moved for summary judgment,

pursuant to Rule 56 of the Federal Rules of Civil Procedure, on all of Eschelbach's claims

other than a portion of his contract claim. For the reasons set forth below, CCF's motion is granted in part and denied in part.[1]

## II. Facts

Unless otherwise noted, the following facts are set forth in the light most favorable to Eschelbach.

### A. The Parties

Eschelbach is an attorney and certified public accountant who lives and works in New York. (Dep. of Karl Eschelbach, taken on Nov. 20, 2001 ("Eschelbach Dep."), at 7, 13; CCF R. 56.1 Stmt. ¶ 6).

CCF is a banking corporation organized under the laws of France with its principal place of business in Paris, France. (CCF R. 56.1 Stmt. ¶ 2).

### B. Eschelbach's Employment at CCF

#### 1. Hiring of Eschelbach

In 1994, CCF hired Eschelbach as head of its Structured Finance section team ("Team") in New York. (Eschelbach Dep. at 25, 41; CCF R. 56.1 Stmt. ¶ 3). The offer letter that CCF sent to Eschelbach ("1994 Letter") stated that Eschelbach would receive a starting salary of $100,000, plus other benefits, including a bonus of fifty percent of his salary during his first year. (Aff. of M. Christine Carty, Esq., sworn to on June 21,

---

[1] The parties have consented to my exercise of jurisdiction over this case for all purposes pursuant to 28 U.S.C. § 636(c). (See Docket No. 29).

2002 ("Carty Aff."), Ex. D at 1).  The 1994 Letter further stated that it was not a contract of employment; hence Eschelbach could be terminated by CCF at any time and "with or without cause."  (Id. at 2).

While he was at CCF, Eschelbach worked in the Madison Avenue office, where he and other members of his Team developed and implemented tax-advantaged transactions for CCF's clients.  (CCF R. 56.1 Stmt. ¶ 6; Eschelbach Dep. at 16).  The clients for whom Eschelbach created these tax-advantaged products included Merck, Hewlett-Packard, Pfizer, Deutsche Bank, Merrill Lynch, Disney, Marriott and AIG.  (CCF R. 56.1 Stmt. ¶ 41; Eschelbach Dep. at 62-63).

2.     Employment Agreement

In early 2000, as a result of press reports indicating that CCF was a target, Eschelbach became concerned that CCF might be acquired by another entity.  (Eschelbach Dep. at 41-42; Dep. of Denis Fontaine-Besset, taken on May 15, 2001 ("Fontaine-Besset Dep."), at 22-23; Dep. of Francois Fournier, taken on May 29, 2002 ("Fournier Dep."), at 27-28).  Eschelbach voiced his concerns to Francois Fournier, CCF's head of structured finance, and "asked . . . if he could arrange for contracts for the members of his [Team]." (Eschelbach Dep. at 43).  According to Eschelbach, Fournier responded enthusiastically to this request because he "wanted to ensure that the [Team] remained in place following an acquisition" to facilitate future "cross-border deals."  (Id. at 45, 48).

Eschelbach subsequently negotiated with Fournier not only on behalf of himself, but also for Steven Donn Broad and Henry Stow Lovejoy, two other Team members. (Id. at 47). Both Broad and Lovejoy are Americans. (Id. at 156; CCF R. 56.1 Stmt. ¶ 31). Eschelbach and Fournier discussed specific contract terms, including a formula to calculate the bonuses of Team members and severance to ensure that they received the highest possible severance consistent with CCF policy and French law. (Eschelbach Dep. at 46). At times, these discussions also involved other senior executives from the French office of CCF, including Denis Fontaine-Besset, Henri DesDeserts, Jean-Paul Foity and Stuart Fraser. (Id. at 49, 51). Both DesDeserts and Fournier, in turn, discussed the proposed Team contracts with the CCF vice-chairman, Charles-Henri Filippi, and the CCF chairman, Charles de Croisset. (Id. at 52).

On or about April 5, 2000, Eschelbach, Broad and Lovejoy each received a letter from Fournier ("2000 Letter"), which confirmed the results of "recent discussions regarding [their] compensation package[s]." (Aff. of Sheryl B. Galler, Esq., sworn to on July 5, 2002 ("Galler Aff."), Exs. C, K, M). The 2000 Letters purported to set forth "clear rules for bonus payments" to be made by CCF in 2001 and 2002, confirmed that the recipients' fringe benefits would be "maintained unchanged," and stated that their

severance packages would be consistent with "CCF Charterhouse[2] policy" and the

requirements of French law.  (Id.).

---

Notwithstanding the reference to "clear rules," the bonus provisions of the 2000 Letters are, in fact, fairly complicated. One principle underlying the payments, however, is that they would be "computed as a percentage of the operating income generated by <u>new deals</u> closed in year 2000, except for [a Hewlett-Packard] transaction closed in February [2000] that ha[d] already been taken into consideration for the bonus paid in year 2000."[3] (<u>Id.</u> at 1) (emphasis added).

The 2000 Letter further provided that Eschelbach's year 2000 bonus would not exceed U.S. $330,000 and would be paid on "January 15, 2001 <u>provided [he was] still employed by [CCF,]</u> irrespective of any reorganization of the CCF Group." (<u>Id.</u> Ex. C at 1) (emphasis added). If Eschelbach was dismissed for any reason other than gross negligence or willful misconduct or resigned voluntarily to avoid a forced relocation outside the New York metropolitan area, the 2000 Letter stated that he would receive his bonus payments for 2000 and 2001 no later than fifteen days after his termination. (<u>Id.</u>).

In addition to its provisions regarding bonuses, Eschelbach's 2000 Letter described the severance payments to which he would be entitled in the event of his

---

[3]     Pursuant to Eschelbach's 2000 Letter, the bonus percentage for deals closed on or before June 30, 2000, was 2.9%. (<u>Id.</u>). For deals that closed after June 30, 2000 and before December 31, 2000, the percentage was 1.5%. (<u>Id.</u>). "Such deals [were] also [to] be included for [Eschelbach's] year 2001 bonus to be paid on January 15, 2002, and a percentage of 2.9% [was to] be applied in the operating income derived from such deals during the first twelve months following the closing dates, reduced by the amount already recognized in the year 2000." (<u>Id.</u>). The 2000 Letter defined "operating income" to include fees, commissions and pre-tax equivalent spread income . . . which is either received, earned, or accrued prior to year-end." (<u>Id.</u>).

termination. (Id. at 2). The Letter provided that if he was terminated before December 31, 2000, his severance would not be less than US $175,000; if he was terminated after that date, he was to receive the equivalent of not less than nine months of his salary (excluding any bonuses). (Id.).

3.     Competing Employment Offer

On April 4, 2000, the day before CCF sent Eschelbach the 2000 Letter, Credit Lyonnais offered him a position as Director of the Structured Tax Products Group of the United States branch of Credit Lyonnais. (Galler Aff. Ex. F; Eschelbach Dep. at 117). In his amended complaint, Eschelbach alleges that the total compensation package proposed by Credit Lyonnais exceeded what CCF was offering him. (Am. Compl. ¶ 12). Eschelbach nevertheless declined the Credit Lyonnais offer since he wanted to remain with CCF. (Id. ¶ 13).

4.     CCF's Integration into HSBC

Throughout the spring of 2000, as the proposed merger was progressing, Eschelbach attended a series of meetings with senior HSBC executives regarding the future of his Team. (Eschelbach Dep. at 116, 122). During these discussions, Eschelbach formed the impression that the HSBC executives disagreed with "the basic proposition that the [Team] would be maintained as a separate and distinct unit within HSBC." (Id. at 125).

As Eschelbach correctly sensed, between May and July of 2000, there was a "shift in the integration plans," such that the CCF Team was going to be "absorbed directly into the HSBC team as opposed to remaining . . . independent." (Id. at 127). Despite this change, the American members of the Team – Eschelbach, Broad and Lovejoy – each wished to pursue employment with HSBC. (Id. at 130).

In the course of attempting to achieve a smooth transition, Eschelbach met with Lee Resseguie, an American who was the head of HSBC's Structured Finance department in the United States, and Gail Burlane, the head of HSBC's Human Resources department. (Id. at 132). At the meeting, Burlane seemed reluctant to accept the provisions of the 2000 Letter regarding severance, and Resseguie seemed "uncomfortable" with the fixed percentage bonus. (Id. at 133).

In an attempt to be conciliatory, Eschelbach was willing to forego some of the provisions of his 2000 Letter, as evidenced by a proposed employment contract that he drafted and sent to either Resseguie or Burlane. (Id. at 133-34). In his draft, Eschelbach proposed that HSBC adopt the terms of the 2000 Letter, but that there be "some sort of sunset provision," so that he would become an at-will employee of HSBC "at some point in the not-too-distant future." (Id. at 134).

5.    Eschelbach's Termination

On September 6, 2000, Eschelbach was instructed to go to the office of

Jean-Jacques Salomon, the general manager of the CCF New York branch, ostensibly to discuss a financial transaction that would utilize the branch's net operating loss. (Id. at 136). When he arrived, Eschelbach was presented with a letter from Salomon which explained that Eschelbach was not going to be offered a position with HSBC, and that his employment by CCF was being terminated effective immediately. (Galler Aff. Ex. D; Eschelbach Dep. at 137). The letter also directed Eschelbach to meet with Navnit Singh of HSBC's Human Resources Department to discuss his severance package. (Galler Aff. Ex. D). Eschelbach signed the letter and then left CCF's premises as the letter directed. (Id.; Eschelbach Dep. at 137).

Despite this turn of events, HSBC's original inclination had been to incorporate all of the Team members – including Eschelbach – into HSBC's counterpart group managed by Resseguie. (CCF R. 56.1 Stmt. ¶¶ 13-15; Dep. of Lee Resseguie, taken on Mar. 7, 2002 ("Resseguie Dep."), at 17). Ultimately, however, Resseguie recommended that Eschelbach be terminated. (Resseguie Dep. at 22). At least four factors played a role in his decision. First, although Resseguie had offered Eschelbach a position as a senior member of the proposed merged group, Eschelbach insisted that he wanted to be "Co-Head" of the group with Resseguie. (Id. at 22-23; CCF R. 56.1 Stmt. ¶¶ 15-16). Second, Resseguie felt that Eschelbach had failed to cooperate in the move of his Team from 590 Madison Avenue to 140 Broadway as part of the merger. (Resseguie Dep. at 23; CCF R. 56.1 Stmt. ¶ 18). Third, Resseguie believed that Eschelbach's

recalcitrance regarding the move was consistent with what Resseguie had been told by Salomon and Fournier – namely, that Eschelbach was "difficult" and "a troublemaker." (Resseguie Dep. at 20; CCF R. 56.1 Stmt. ¶ 20; Dep. of Jean-Jacques Salomon, taken on May 20, 2000 ("Salomon Dep."), at 48-49). Finally, Resseguie considered the modifications of the 2000 Letter in Eschelbach's proposed contract to be "unacceptable and unreasonable." (Resseguie Dep. at 23; CCF R. 56.1 Stmt. ¶ 19).

6.    Post-Termination Payments

By letter dated June 27, 2001, CCF's counsel sent Eschelbach's counsel a CCF check payable to Eschelbach in the amount of $351,766. (Carty Aff. Ex. G). This sum consisted of the guaranteed $175,000 minimum amount of severance pay, a bonus in the amount of $159, 500 on a Merck transaction, and interest. (See id.). CCF represented that this was "the full amount owed to him by CCF." (Id.).

D.    This Lawsuit

On March 1, 2001, Eschelbach filed his original complaint, which alleged that, by reason of its refusal to pay him $2,200,513 in severance payments, benefits and bonuses to which he was entitled, CCF (1) breached the terms of the 2000 Letter, (2) breached its implied covenant of good faith and fair dealing, (3) was unjustly enriched, and (4) owed him the reasonable value of his services in quantum meruit. Eschelbach's original complaint also contended that CCF's treatment of him violated the New York

State and New York City Human Rights Laws. Finally, the original complaint alleged that CCF's actions violated French law. (See Docket No. 1).

On January 30, 2002, Eschelbach filed an amended complaint in which he realleged each of his original causes of action against CCF. (See Docket No. 13). The amended complaint also added an eighth cause of action which alleges that CCF wrongfully withheld wages and demanded early repayment of a mortgage held by CCF, in violation of the New York Labor Law. (Id. ¶¶ 56-59).

Eschelbach's claim that he is owed more than $2 million has a number of components. First, Eschelbach alleges that the Merck and Hewlett-Packard transactions were "redone" in 2000 to comply with a change in French tax law, thereby entitling him to a further bonus, even though no new revenue was generated for CCF. (See CCF R. 56.1 Stmt. ¶¶ 42-45; Eschelbach R. 56.1 Stmt. ¶¶ 24-27). Second, Eschelbach alleges that he was entitled to a bonus on a restructured AIG transaction. (See Eschelbach R. 56.1 Stmt. ¶¶ 29-30). Finally, Eschelbach contends that he is entitled to bonus compensation with respect to several deals that CCF allegedly failed to close during 2000 in order to deprive him of his bonuses. (See id. ¶¶ 28, 30; Eschelbach Mem. at 12).

CCF's position with respect to the demand for these additional payments is that Eschelbach was paid a bonus for the Hewlett-Packard transaction (as stated in the 2000 Letter) and that the deals for Pfizer, Deutsche Bank, Merrill Lynch, Disney, Marriott and AIG never closed. (CCF R. 56.1 Stmt. ¶¶ 45-51; CCF Mem. at 8-9). CCF also

contends that Eschelbach is not entitled to any additional bonus income with respect to the restructured transactions because they did not generate any new revenues. (CCF R. 56.1 Stmt. ¶ 42; CCF Mem. at 8-9).

III.    Discussion

A.    Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. See Kulak v. City of New York, 88 F.3d 63, 70 (2d Cir. 1996). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court. Fischl, 128 F.3d at 55. See also Fed. R. Civ. P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues

of fact but only to determine whether there is a genuine issue of material fact to be tried." Fischl, 128 F.3d at 55.

To defeat a motion for summary judgment, the non-moving party cannot merely rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The Second Circuit has cautioned that summary judgment is often inappropriate in cases where the trier of fact will have to delve into an employer's intent, because intent is an issue as to which direct evidence is rarely available. See, e.g., Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994); Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984). However, when an employer has explained its conduct and the plaintiff has offered only conclusory assertions in opposition, summary judgment may be granted. See, e.g., Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases.").

B.    Merits

1.    First and Second Causes of Action:  Breach of Contract
       and Implied Covenant of Good Faith and Fair Dealing

In his first cause of action, Eschelbach alleges that CCF breached its contract with him by refusing to remit the severance payments, benefits and bonuses to which he was entitled pursuant to the terms of the 2000 Letter. (Am. Compl. ¶ 21). CCF concedes that there is a material factual issue with respect to the adequacy of its severance payments, but contends that Eschelbach was, as a matter of law, an at-will employee. (See CCF Mem. at 5-7; 23-24). Additionally, CCF maintains that Eschelbach received all of the bonus compensation to which he was entitled. (See id. at 8).

"It is still-settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." Enowitz v. Sanwa Bus. Credit Corp., 902 F. Supp. 59, 61 (S.D.N.Y. 1995) (quoting Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 333 (1987)). Accordingly, an employee who has not been hired for a defined period may be terminated for any reason or even no reason. See Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 300 (1983). An exception to the at-will doctrine exists only when the plaintiff is able to demonstrate that there is an express written agreement limiting the employer's otherwise unfettered right of termination. See Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 461 (1982). The burden of proving such an express agreement, which rests with the plaintiff, is extremely heavy. As the Sabetay court noted, because of this burden, since Weiner, "plaintiffs alleging wrongful discharge have not fared well." Sabetay, 69 N.Y.2d at 334-35 (citing, inter alia, O'Connor v. Eastman Kodak Co., 65 N.Y.2d 724, 725

(1985); Murphy, 58 N.Y.2d at 304-05; Collins v. Hoselton Datsun, Inc., 503 N.Y.S.2d

203 (4th Dep't 1986); Rizzo v. Int'l Bd. of Teamsters, Local 237, 486 N.Y.S.2d 220 (1st

Dep't 1985); Citera v. Chem. Bank, 481 N.Y.S.2d 694 (3rd Dep't 1984); and Patrowich

v. Chem. Bank, 470 N.Y.S.2d 599 (1st Dep't 1984)).

There is no dispute in this case that Eschelbach was hired by CCF in 1994 as

an at-will employee.  (See 1994 Letter; CCF R. 56.1 Stmt. ¶ 4).  Eschelbach contends,

however, that the 2000 Letter replaced the 1994 Letter and changed his status so that he

was no longer an employee at will.  (Eschelbach R. 56.1 Stmt. ¶ 1).  He further contends

that the 2000 Letters constitute employment contracts for a definite term of two years, and

that both he and Broad read them that way.[4]  (See Eschelbach Dep. at 72; Dep. of Steven

Donn Broad, taken on Jan. 23, 2002, at 30 (contending that the length of the contract was

"[t]wo to three years"); see also Eschelbach Mem. at 9).  Eschelbach also observes that he

relied to his detriment on his understanding of the 2000 Letter by turning down the

financially more lucrative Credit Lyonnais offer.  (Eschelbach Mem. at 9).

Even if the Court were to assume, arguendo, that Eschelbach and his

cohorts bargained for a commitment that they would be employed by CCF or its successor

for a definite term, it is clear from the face of the 2000 Letter that this is not what they

received.  Thus, the 2000 Letter unambiguously states that Eschelbach's 2000 bonus

---

[4]    The 2000 Letter indicates that Eschelbach's bonus for 2001 was to be paid on
January 15, 2002.  (See Galler Aff. Ex. C at 1).  Since there is no indication that CCF owed any
duties to Eschelbach beyond that date, it is unclear why Eschelbach considers the 2000 Letter,
which is dated April 5, 2000, an employment contract for a full two-year period.

15

would be paid in early 2001, "provided that [he was] still employed by the CCF Group." (Galler Aff. Ex. C at 1). Moreover, it is clear that this condition precedent did not simply address the possibility that Eschelbach might resign from his job because the 2000 Letter expressly addresses the issue of when his bonus payment would be made if he were to be "dismissed for any reason other than for gross negligence or willful misconduct." (Id.). Accordingly, because the language of the 2000 Letter plainly contemplated the possibility that Eschelbach would be terminated prior to the end of 2001 for reasons other than unsatisfactory performance or misbehavior, it cannot fairly be read as modifying the presumption that Eschelbach continued as an at-will employee.

The cases cited by Eschelbach are not to the contrary. For example, in Jones v. Dunkirk Radiator Corp., 21 F.3d 18 (2d Cir. 1994), the plaintiff was employed by a corporate joint venturer pursuant to an agreement that provided that the plaintiff would become a partner in the venture once it got off the ground. To induce the plaintiff to resign from his current employment in the interim, the corporate joint venturer agreed, in writing, to invest at least $150,000 in the business and to transfer it to the proposed partners once it had generated annual sales of $1.8 million. Thereafter, however, the corporate joint venturer terminated the plaintiff before sales had reached the required level and liquidated the business four months later. On these facts, the Court of Appeals held that one possible interpretation of the agreement was that the parties had entered into an employment contract with an "ascertainable term measured by either achievement of the

$1.8 million threshold to spin-off the venture or [the co-venturer's] decision to abandon the project any time after expending the $150,000 . . ." Id. at 22. The court further concluded that if the finder of fact so found, the plaintiff would have been entitled to damages consisting of his salary from the time of his discharge until the actual sale of the business. Id. Summary judgment therefore was denied. Id. at 23.

Similarly, in TSR Consulting Servs., Inc. v. Steinhouse, 699 N.Y.S.2d 375 (1st Dep't 1999), the plaintiff was offered a managerial position pursuant to a letter agreement which promised him a salary of $120,000 for "the first twelve months of . . . employment through May 31, 1998," "a guaranteed non-recoverable draw of $10,000 against commissions for this same period," and a "guaranteed recoverable draw of $120,000 against commissions" for "the second year of . . . employment." Id. at 376 (emphasis added). The Appellate Division held that this language could be interpreted to mean that the agreement "merely measured [the plaintiff's] salary with reference to a yearly rate," or that it constituted "a contract for a fixed period of time," in which event it "could be terminated only upon a showing of just cause." Id. Given these two plausible alternatives, the employer's motion for summary judgment was denied. Id. at 377.

Here, by comparison, the 2000 Letter expressly stated that Eschelbach would be paid a bonus within fifteen days if he was "dismissed for any reason other than for gross negligence or willful misconduct." (Galler Aff. Ex. C at 1) (emphasis added). The agreement consequently clearly contemplated that CCF could fire Eschelbach without

cause.  Since the 2000 Letter permitted CCF to take that action, Eschelbach has not – and cannot – overcome the presumption that he remained an at-will employee.

The fact that CCF could terminate Eschelbach for any reason – or even no reason – does not extinguish his entire contract claim.  Indeed, as noted above, CCF concedes that there is a factual issue as to the additional amount, if any, that Eschelbach is entitled to be paid.  Under the 2000 Letter, because he was fired before December 21, 2000, Eschelbach was entitled to receive the greater of $175,000 or "the amount provided for in CCF Charterhouse policy," including, but not limited to any amount required by "French law, [the] Convention Collective des Banques[, or] any collective agreement benefit[t]ing . . . CCF Charterhouse's employees."  (Id. at 2).  Since CCF has not shown that the $175,000 (plus interest) that it eventually tendered to Eschelbach exceeded the amounts he was eligible to receive under these alternative compensation formulas, summary judgment with respect to the actual amount that he is owed would be improper.

The 2000 Letter provided that, in addition to severance, CCF would pay Eschelbach bonuses for calendar years 2000 and 2001.  Eschelbach does not dispute that he received bonus compensation in June 2001 for a deal involving Merck.  (See Galler Aff. Ex. P).  He nevertheless contends that he was entitled to additional compensation on the Merck and Hewlett-Packard deals because they were "redone" during the relevant time period.  (Eschelbach R. 56.1 Stmt. ¶¶ 24, 26-27).

The 2000 Letter provides that Eschelbach is entitled to bonus compensation based on the "operating income generated by <u>new deals</u> closed in year 2000 except for the [Hewlett-Packard] transaction closed in February that has already been taken into consideration for the bonus paid in year 2000." (Galler Aff. Ex. C at 1) (emphasis added). In its motion papers, CCF maintains that a "redone" deal cannot be considered a "new deal" because it generates no additional operating income. (CCF Mem. at 9 n.3). Eschelbach evidently disagrees, noting that CCF would not have earned its expected operating income had the deals not been restructured. (Eschelbach R. 56.1 Stmt. ¶¶ 24, 26-27, 30). While CCF appears to have the more reasonable interpretation of the term "new deals," the Court cannot say, as a matter of law, that a restructured deal could not be a "new deal" within the meaning of the 2000 Letter. Therefore, Eschelbach is also entitled to a trial with respect to this issue.

Finally, Eschelbach concedes that several other deals that he was working on never closed, but argues that CCF's failure to complete them gives rise to a breach of the covenant of good faith and fair dealing implied in every contract. (<u>See</u> Eschelbach Mem. at 12). The basis for this claim is his assertion that CCF and HSBC used up CCF's "tax capacity" through a series of internal transactions which made it impossible for many of his Team's deals to close. (<u>Id.</u>).

"Under New York Law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying

contract." Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc., No. 02 Civ. 7666 (LBS), 2004 WL 1886293, at *8 (S.D.N.Y. Aug. 24, 2004) (quoting Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)).  The implied covenant requires a party not to "intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part."  Kader v. Paper Software, Inc., 111 F.3d 337, 342 (2d Cir. 1997) (quoting Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 230 (2d Cir. 1991), and Grad v. Roberts, 14 N.Y.2d 70, 75 (1964)) (emphasis in original).  The covenant does not reach so broadly, however, that it precludes a party from making business decisions which further its own interests.  M/A-Com Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990).

In Wakefield v. Northern Telecom, Inc., 769 F.2d 109 (2d Cir. 1985), the plaintiff alleged that the defendant breached the implied covenant of good faith and fair dealing by firing him solely "in order to avoid paying him commissions on sales that were completed but for formalities."  Id. at 111-12.  The Second Circuit observed that "an unfettered right to avoid payment of earned commissions in the principal or employer creates incentives counterproductive to the purpose of the contract itself in that the better the performance by the employee, the greater the temptation to terminate."  Id. at 112-13. For that reason, the court concluded that the plaintiff could recover if he was terminated for the express purpose of cutting off his commissions.  Id. at 113.

In this case, Eschelbach argues that he is entitled to recover for a breach of the implied covenant because CCF's internal dealings with HSBC were the "direct cause" of his diminished bonus payments. (Eschelbach Mem. at 12). Assuming that this is so, Eschelbach still has not adduced any evidence which might cause a reasonable juror to believe that the purpose of the CCF/HSBC transactions was to reduce or eliminate his bonus payments. In the absence of such evidence, Eschelbach is not entitled to recover damages simply because certain measures that CCF and HSBC took to further their own interests had an adverse effect on his income. Accordingly, Eschelbach's second cause of action, which alleges that CCF breached its implied covenant of good faith and fair dealing, must be dismissed.

> 3.   Third and Fourth Causes of Action:
>       Quantum Meruit and  Unjust Enrichment

In his third and fourth causes of action, Eschelbach seeks to recover damages under the equitable doctrines of unjust enrichment and quantum meruit. To establish a claim for unjust enrichment under New York law, a plaintiff must show that (a) the defendant was enriched, (b) at the plaintiff's expense, (c) under circumstances in which "equity and good conscience" require the defendant to make restitution. Kids Cloz, Inc. v. Officially For Kids, Inc., 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (quoting Astor Holdings, Inc. v. Roski, No. 01 Civ. 1905 (GEL), 2002 WL 72936, at *17 (S.D.N.Y. Jan.

17, 2002)).  "Under the doctrine of quantum meruit, when one party agrees to accept the services of another [party who expected compensation], an implied contract to pay the reasonable value of such services is formed."  Fashionwear (PVT) Ltd. v. Regatta (U.S.A.) LLC, No. 03 Civ. 5597 (JFK), 2004 WL 2210258, at *3 (S.D.N.Y. Sept. 30, 2004) (emphasis in original).  The two doctrines are closely related and often considered together. See id. at n.1; Kidz Cloz, 320 F. Supp. 2d at 177.  Nevertheless, neither of these avenues of recovery is available when an express contract covers the relationship between the parties.  See Fashionwear, 2004 WL 2210258, at *3.  There is, however, a limited exception to this general rule when the express contract fails to cover the particular issue in dispute.  Id. (citing Hotel Aquarius, B.V. v. PRT Corp., No. 92 Civ. 4498 (MBM), 1992 WL 391264, at *5 (S.D.N.Y. Dec. 22, 1992)).

       In this case, Eschelbach argues that he falls within the exception to the rule because there are issues of fact as to whether CCF has paid him the sums to which he is entitled under the 2000 Letter.  (Eschelbach Mem. at 13).  However, those questions plainly arise under the 2000 Letter, not outside its terms.  Eschelbach consequently is not entitled to pursue his quasi-contract claims in separate causes of action.

       In an attempt to avoid this conclusion, Eschelbach notes that a plaintiff may elect to rescind an express contract in certain circumstances.  (Id.).  Under New York law, in order to do so, a plaintiff must establish "compelling equitable grounds," such as a "failure of consideration, fraud in the inducement, [an] inability to perform, or a breach

that substantially defeats the purpose" of the contract. <u>Reilly v. Natwest Mkts. Group,</u> <u>Inc.</u>, 181 F.3d 253, 263 (2d Cir. 1999) (citing <u>H.B.L.R., Inc. v. Command Broad. Assocs.,</u> <u>Inc.</u>, 548 N.Y.S.2d 198, 199 (1st Dep't 1989), and <u>Babylon Assocs. v. County of Suffolk</u>, 475 N.Y.S.2d 869, 874 (2d Dep't 1984)).  For a contract breach to give rise to a right of rescission, it must be "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." <u>Babylon Assocs.</u>, 475 N.Y.S.2d at 874 (quoting <u>Callanan v. Keeseville, Ausable Chasm,</u> <u>& Lake Champlain R.R. Co.</u>, 199 N.Y. 268, 284 (1910)).

Here, the dispute between Eschelbach and CCF does not come close to meeting the requisite threshold.  Indeed, it is undisputed that even after he was terminated, Eschelbach was paid an additional $351,766 in bonus and severance pay.  (<u>See</u> Carty Affirm. Exs. G, H).  There also has been no showing that CCF entered into the 2000 Letter without an intention to perform its end of the agreement.  The 2000 Letter therefore is not subject to rescission on the theory that there was a failure of consideration, fraud in the inducement, or a breach that essentially eviscerated the contract.

Eschelbach's third and fourth causes of action to recover damages for unjust enrichment and in quantum meruit therefore must be dismissed.

4.    Fifth and Sixth Causes of Action:
      New York City and State Human Rights Law

Eschelbach's fifth and sixth causes of action allege that CCF discriminated against him on the basis of his national origin in violation of the New York State Human Rights Law, N.Y. Exec. Law Section 296, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, et seq.  Allegations of discrimination under both statutes are evaluated using the familiar analytic framework set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973), with respect to claims under Title VII of the Civil Rights Act of 1964.  See Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003); Staff v. Pall Corp., 233 F. Supp. 2d 516, 527 (S.D.N.Y. 2002).  Therefore, to make out a prima facie case under either statute, a plaintiff must establish that he "([a]) is a member of a protected class; ([b]) was performing [his] duties satisfactorily; ([c]) was discharged; and that ([d]) [his] discharge occurred under circumstances giving rise to an inference of [national origin] discrimination."  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000); see also Mandell, 316 F.3d at 377 (citing Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000)).  As many courts have noted, meeting this threshold is not difficult.  See, e.g., Mandell, 316 F.3d at 378 ("The burden of establishing a prima facie case under McDonnell Douglas is minimal.");  Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998) (describing the burden as "de minimis").  The prima facie showing, if made, gives rise to a presumption of unlawful discrimination.  Texas Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 249, 252-54 (1981); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180-81.

Once a plaintiff has made the minimal showing necessary to establish a prima facie case, the burden shifts to the employer to proffer a legitimate nondiscriminatory reason for its action. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 (2d Cir. 2000), rev'd on other grounds, Parker v. Sony Pictures Entm't., Inc., 260 F.3d 100 (2d Cir. 2001). If the employer meets this requirement, the presumption arising out of the prima facie showing drops out of the case, and the burden of persuasion rests with the plaintiff to establish a statutory violation. Burdine, 450 U.S. at 253.

At this stage, the plaintiff has "the opportunity to demonstrate . . . that the proffered reason was not the true reason for the employment decision, and that [national origin] was." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993) (internal quotes and citation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

CCF concedes that Eschelbach was born in the United States and is therefore a member of a protected class insofar as he is advancing a claim of discrimination on the basis of his national origin. (See CCF Mem. at 14). CCF also admits, as it must, that Eschelbach was discharged. (Id.). Finally, for purposes of this motion, CCF does not dispute that Eschelbach was performing his job satisfactorily. (Id.). Thus, to establish his

prima facie case, Eschelbach need only adduce evidence from which a finder of fact could reasonably conclude that he was discharged under circumstances giving rise to an inference of discrimination on the basis of his national origin.

Here, the evidence establishes that HSBC originally planned to hire all five members of the Team, including Eschelbach. After Eschelbach insisted on being co-head of the combined unit and failed to cooperate in the physical move of the Team to HSBC's offices, Resseguie, who is an American, decided to terminate him. At the same time, however, HSBC hired Broad and Lovejoy, the other Americans who were part of the Team. (See Eschelbach Dep. at 156). Given these undisputed facts, Eschelbach plainly has not shown, as he must, that the circumstances of his termination evidenced discrimination by CCF against him on the basis of his national origin.[5]

In his opposition papers, Eschelbach argues that it is not his termination, but, rather, the contracts that CCF allegedly entered into with its French employees "before HSBC stepped into the picture" that give rise to his discrimination claim. (Eschelbach Mem. at 14). According to Eschelbach, unlike the 2000 Letters, the contracts with the

---

[5]     CCF also contends that Arthur Blot-LeFevre, one of the two French members of the Team, was neither hired by CCF nor retained by HSBC at the time of the acquisition. (See CCF R. 56.1 Stmt. ¶ 33). The relevant facts with respect to Blot-LeFevre, however, are far from clear. At his deposition, Salomon testified that Blot-LeFevre was a "special case" because he was "in France" and working for CCF while on military duty. (Salomon Dep. at 36). Salomon also noted that CCF was not interested in hiring Blot-LeFevre and that he "never made it to HSBC." (Id.). Notwithstanding these representations, Broad testified that Blot-LeFevre went back to Paris and later went to work for a division of HSBC in the United States. (See Broad Dep. at 60).

French CCF employees protected them from termination in the event CCF was acquired. (Id.).

CCF contends that there has been no showing that its contracts with its French employees protected them from termination in the event of a takeover. (CCF Reply Mem. at 8). Indeed, CCF maintains that one French member of the Team was terminated. (See n.5, supra). Eschelbach disputes CCF's contention that its French employees did not have added protection, citing the deposition testimony of Salomon, who testified that he was not concerned about his job in the United States because his employment agreement provided that, in the "worst case," he would be "brought back to Paris, with a lower salary," but would "have a job." (Salomon Dep. at 13). Eschelbach also relies on the testimony of Fountain-Besset, who explained that his employment agreement "survived from 1996 until now, and it survives when I've been put in a different company of CCF and when I've been merged." (Fontaine-Besset Dep. at 8-9).

The only evidence that CCF has been able to muster in support of its contention that its French employees were not promised employment for a definite period or that they would be terminated only for cause is a different portion of Salomon's deposition testimony. (See CCF Reply Mem. at 8). In that excerpt, Salomon's testified that "[he] was an expatriate" and therefore "didn't care too much about [his] job." (Salomon Dep. at 12). Simply put, this statement does not suggest that he or the other French nationals employed by CCF in the United States did not receive protections that

were not available to CCF's American employees.  Moreover, Salomon's testimony that

he still "[would have] a job" if his employment in the United States ended would permit a

reasonable juror to conclude that CCF had provided him with some form of job security.

(Id. at 13).  Accordingly, Eschelbach has made the minimal showing necessary to establish

a prima facie case of disparate treatment on the basis of national origin.

Like a claim of discriminatory termination, a disparate treatment claim is

analyzed pursuant to the McDonnell Douglas rubric.  Hollander v. Am. Cyanamid Co.,

895 F.2d 80, 83 (2d Cir. 1990); Gonzalez v. City of New York, 354 F. Supp. 2d 327, 338-

39 (S.D.N.Y. 2005).  Accordingly, because Eschelbach has met his burden of establishing

a prima facie case, the burden shifts to CCF to provide a nondiscriminatory reason for the

allegedly disparate treatment.  In this case, however, because CCF denies that it has

provided different contract terms for its French employees, it has not attempted to shoulder

this burden.  As a consequence, CCF has not overcome the presumption of discrimination

arising out of Eschelbach's prima facie showing.

CCF's motion for summary judgment on Eschelbach's fifth and sixth causes

of action therefore must be denied insofar as Eschelbach alleges that he was the victim of

disparate treatment.

5.      "French Law"

Eschelbach's seventh cause of action alleges that "CCF's refusal to pay to him the severance payments, benefits and bonuses due and owing to him under the terms of the [2000 Letter] constitutes a violation of French Law." (Am. Compl. ¶ 53).

Under Rule 44.1 of the Federal Rules of Civil Procedure, questions of foreign law are no longer regarded as questions of fact. Consequently, the court's determination of an issue of foreign law is treated as a ruling on a question of law. See Vishipco Line v. Chase Manhattan Bank, N.A., 660 F.2d 854, 859-60 (2d Cir. 1981). To assist the court in determining such issues, the rule requires "[a] party who intends to raise an issue concerning the law of a foreign country [to] give notice by pleadings or other reasonable written notice." Fed. R. Civ. P. 44(1). That notice must set out the foreign law in sufficient detail that the court can determine its effect. See Anglo Am. Ins. Group, P.L.C. v. CalFed, Inc., 899 F. Supp. 1070, 1076 (S.D.N.Y. 1995) (quoting Curtis v. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y. 1980)) ("Foreign law should be argued and briefed like the domestic law.").

In this case, both in his complaint and in his opposition papers, Eschelbach has failed to point to any specific provision of French law which would justify his bringing a separate claim for relief. Indeed, he has not identified any such provision which would entitle him to recover additional damages under his contract claim.

Accordingly, because Eschelbach has failed to meet his burden, his seventh cause of action must be dismissed.

6. New York Labor Law

Eschelbach's eighth and final cause of action alleges that "CCF's willful failure to pay [him] his contractually promised wages (including, but not limited to, bonuses, benefits and severance payments)" and "willful demand that [he] make early payment of his mortgage with CCF" violated Section 193(1) of the New York Labor Law, which prohibits the taking of anything other than authorized deductions from wages.[6] (See Am. Compl. ¶¶ 56-57; Eschelbach Mem. at 16). As a consequence of that alleged violation, Eschelbach also seeks damages under Section 198 of the Labor Law, which provides that a plaintiff who succeeds on a claim under Section 193(1) shall recover "attorney's fees and, upon a finding that the employer's failure to pay the wage required . . . was willful, an additional amount as liquidated damages equal to twenty-five percent of

---

[6] The full text of the statute is as follows:

No employer shall make any deduction from the wages of an employee, except deductions which:

    a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or

    b. are expressly authorized in writing by the employee and are for the benefit of the employee; provided that such authorization is kept on file on the employer's premises. Such authorized deductions shall be limited to payments for insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization, and similar payments for the benefit of the employee.

N.Y. Labor Law § 193(1) (McKinney 2004).

the total amount of the wages found to be due." N.Y. Labor Law § 198(1-a) (McKinney 2002). (See Am. Compl. ¶ 60; see also letter to the Court from Sheryl B. Galler, Esq., dated July 14, 2004, at 1).

In its papers, CCF contends that Section 193(1) is inapplicable because an employer's failure to make a required payment cannot be considered a "deduction" from wages. (CCF Reply Mem. at 9). CCF argues that Eschelbach's Labor Law claim therefore can only be brought under Section 191(3), which requires that following the termination of an employee, the employer pay any wages due "not later than the regular pay day for the pay period during which the termination occurred." (Id. (citing, inter alia, Leiser v. Daniels & Co., Inc., No. 01 Civ. 2932 (DLC), 2002 WL 1285558, at *11 (S.D.N.Y. June 11, 2002) ("Under Section 191, employers are required to pay commissioned salesmen 'the wages, salary, drawing account, commissions and all other monies earned or payable in accordance with the agreed terms of employment.'")); see also Watson v. Prentice-Hall, Inc., 376 N.Y.S.2d 339, 341 (4th Dep't 1975) ("Section 191(1)(c) of the Labor Law requires the employer to pay bonuses at a date no later than that specified in the agreement between the employer and the employees.").

CCF contends that Section 191 is inapplicable to Eschelbach because he described himself as the "head of [CCF's] Structured Finance section team" and therefore falls within a statutory exclusion for employees serving in an executive, administrative, or managerial capacity. (See CCF Mem. at 20-21). In advancing this argument, CCF relies

on Gottlieb v. Kenneth D. Laub & Co. Inc., 82 N.Y.2d 457, 461 (1993). In that case, the New York Court of Appeals concluded that "[e]xcept for manual workers, all other categories of employees entitled to statutory protection under Labor Law § 191 are limited by definitional exclusions of one form or another for employees serving in an executive, managerial or administrative capacity." Id. at 461.

In Miteva v. Third Point Mgmt. Co., LLC, 323 F. Supp. 2d 573 (S.D.N.Y. 2004), which was decided after CCF's motion was fully submitted, Judge Marrero engaged in an exhaustive analysis of the extent to which Gottlieb altered preexisting case law holding that Article 6 of the Labor Law (of which Sections 190 through 198 are a part) applies to executives and professionals unless they are expressly excluded. As he explained, "the text of Article 6, as well as its context, and weight of caselaw applying the statute, support a broad interpretation of the definition of 'employee,' and the conclusion that executives, professionals, managers and administrators are not categorically excluded from the definition of 'employee' in Section 190(2) of Article 6." Id. at 585. For that reason, Judge Marrero held that the plaintiff in Miteva, an analyst who allegedly was promised a bonus of $650,000, but was terminated four days before it was due, could maintain her claim, which was brought under several sections of Article 6 of the Labor Law, including Sections 191(3) and 193. Id. at 577, 585.

More recently, in Pachter v. Bernard Hodes Group, Inc., No. 03 Civ. 10239 (RPP), 2005 WL 2063838, at *3-*4 (S.D.N.Y. Aug. 25, 2005), Judge Patterson adopted

the reasoning of Mitera. The plaintiff account representative therefore was permitted to maintain an action under Section 193 to recover unpaid commissions even though she worked in an administrative or executive capacity. Id.

Accordingly, despite his status as an executive, Eschelbach is entitled to pursue his unpaid wage claim – even if it should have been brought under Section 191(3), rather than Section 193(1), of the Labor Law. Nonetheless, both Sections 191(3) and 193(1) relate to wages. CCF's insistence that Eschelbach repay or refinance his mortgage, even if established, clearly does not amount to either a deduction from his wages or the failure to pay him his wages on a timely basis. See N.Y. Labor Law § 190(1) (McKinney 2002) (defining the term "wages"); see also id. § 198-c(2) (defining "benefits" and "wage supplements"). To the extent that Eschelbach seeks to bring a Labor Law claim related to his mortgage, CCF therefore is entitled to summary judgment.

As noted above, under Section 198 of the Labor Law, an employee establishing a violation of either Section 191 or Section 193 of the Labor Law may recover his attorney's fees, as well as liquidated damages equal to twenty-five percent of the withheld wages if the failure to pay him his required wages is shown to be willful. N.Y. Labor Law § 198(1-a). CCF contends that Eschelbach is not entitled to such relief in this case because it paid him nearly $360,000 and "genuinely dispute[d]" Eschelbach's entitlement to any further payments. (See CCF Mem. at 23-24). The 2000 Letter expressly provided that Eschelbach's year 2000 and year 2001 bonuses was to be paid

33

within fifteen days of his termination, if he was dismissed for any reason other than gross negligence or willful misconduct, neither of which is alleged here. (See Galler Aff. Ex. C at 1). In this case, however, it is undisputed that CCF first tendered this sum to Eschelbach some nine months after he was terminated. (See Carty Aff. Ex. G). Because Eschelbach was not terminated for cause, and the payment to him consequently was not made on time, there obviously is a factual issue as to whether CCF's delay was willful.

CCF therefore is not entitled to summary judgment on any aspect of Eschelbach's eighth cause of action other than his claim that CCF's demand for the repayment of his mortgage violated the Labor Law.

IV.    Conclusion

For the foregoing reasons, the second through fourth and seventh causes of action in Eschelbach's amended complaint are dismissed. Additionally, the eighth cause of action is dismissed insofar as it seeks relief related to CCF's insistence that Eschelbach's mortgage be repaid. All other aspects of CCF's motion for summary judgment (Docket No. 20) are denied.

In light of this disposition, the Court will hold a further pretrial conference at 5 p.m. on January 24, 2006, in Courtroom 11C. If this is not convenient, counsel should place a conference call to my Chambers to arrange a different date and time.

SO ORDERED.

Dated:    New York, New York
          January 4, 2006

FRANK MAAS
United States Magistrate Judge

Copies via fax to:

Sheryl B. Galler, Esq.
Hoguet, Newman & Regal, LLP
10 East 40th Street
New York, New York 10016
(212) 689-5101 (fax)

M. Christine Carty, Esq.
Schnader, Harrison, Segal & Lewis, LLP
140 Broadway, Suite 3100
New York, New York 10005
(212) 972-8798 (fax)