UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

KARL ESCHELBACH,                               :

                              Plaintiff,       :       **OPINION AND ORDER**

              -against-                         :       01 Civ. 1778 (FM)

CCF CHARTERHOUSE/CREDIT                        :
COMMERCIAL DE FRANCE n/k/a
HSBC/CREDIT COMMERCIAL                         :
DE FRANCE,
                              Defendant.        :

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.      Introduction

              This action is brought by plaintiff Karl Eschelbach ("Eschelbach") against

his former employer, defendant CCF Charterhouse/Credit Commercial de France, now

known as HSBC/Credit Commercial de France ("CCF").  On January 4, 2006, I granted

in part and denied in part CCF's original motion for partial summary judgment ("PSJ").

(See Docket No. 31) ("Order").  Familiarity with that Order is presumed.  Following the

entry of the Order, CCF moved for reconsideration of a portion thereof, alleging that I

"failed to consider controlling decisions and/or facts that if considered would have

mandated a different result."  (See Docket No. 33 at 1) ("CCF Reconsid. Mem.").  More

recently, CCF also has moved for summary judgment on Eschelbach's fifth and sixth

causes of action, which allege that his termination violated the New York State and New York City Human Rights Laws. (Docket Nos. 39-41).

For the reasons set forth below, CCF's motion for reconsideration is granted. Upon reconsideration, Eschelbach's contract claim is dismissed insofar as he seeks to recover further bonus payments. Additionally, CCF's motion for summary judgment is granted.[1]

II.    Reconsideration

CCF seeks reconsideration of three aspects of my prior Order. First, CCF contends, in connection with Eschelbach's contract claim, that I either "misunderstood or overlooked" the fact that the restructuring of two deals generated by Eschelbach's team resulted in no additional operating income for CCF and, hence, did not entitle him to any further bonus payments. (CCF Reconsid. Mem. at 1). Second, CCF suggests that my ruling that Eschelbach was entitled to pursue a claim under Section 193(1) of the New York State Labor Law, despite his unquestioned status as a CCF executive, "misinterpreted settled New York law" and failed to consider recent controlling New York decisions." (Id. at 2). Finally, CCF argues that I "overlooked" Eschelbach's failure to show that CCF took any deductions from his wages in violation of that statute.[2] (Id.).

_____

[1]    These rulings may not dispose of this case in its entirety because CCF concedes that certain facts concerning the proper amount of CCF's severance payments are disputed. (See Docket No. 22 at 2 n.1) ("CCF PSJ Mem.").

[2]    The Order also suggested that Eschelbach could pursue his Labor Law claim

(continued...)

2

A.    Applicable Standard

The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995) (citing Schonberger v. Serchuk, 742 F. Supp. 108, 119 (S.D.N.Y. 1990)).  A motion for reconsideration is not "an opportunity to 'reargue those issues already considered when a party does not like the way the original motion was resolved.'" Am. Hotel Int'l Group Inc. v. One Beacon Ins. Co., No. 01 Civ. 0654 (RCC), 2005 WL 1176122, at *1 (S.D.N.Y. May 18, 2005) (quoting In re Houbigant, Inc., 914 F. Supp. 997, 1001 (S.D.N.Y.1996)).  Consequently, an abiding conviction that the issue was wrongly decided is not enough to warrant reconsideration; rather, the issue must have been wrongly decided because the court overlooked important decisions or facts.

B.    Contract Claim

The April 5, 2000 letter ("2000 Letter") furnished to Eschelbach sets forth the salient points of his compensation package going forward, but is hardly a model of clarity.  Insofar as relevant to the present motions, the 2000 Letter provided that:

---

[2](...continued)
under Section 191(3) of the Labor Law.  (See Order at 30).  Because Eschelbach concedes that he can only recover under Section 193(1), there is no need to reconsider the applicability of Section 191(3).

. . . Based on the 2000 business plan discussed with you, your bonus will be computed as a percentage of the operating income generated by new deals closed in year 2000 except for the [Hewlett-Packard] transaction closed in February that has already been taken into consideration for the bonus paid in year 2000.

For transactions closed on or before June 30, 2000, the percentage to be applied to the operating income (received, earned or accrued) recognized in 2000 will be 2.9 %.

For deals closed after June 30, 2000 and before December 31, 2000, the percentage to be applied to the operating income recognized in 2000 will be 1.5 %. Such deals will also be included for your year 2001 bonus to be paid on January 15, 2002, and a percentage of 2.9 %, will be applied [to] the operating income derived from such deals during the first twelve month[s] following the closing dates, reduced by the amount already recognized in the year 2000.

For purposes of this letter, "operating income" means fees, commissions, and pre-tax equivalent spread income (pre-tax equivalent revenue less financing costs) which is either received, earned or accrued prior to year-end.

(Affirm. of Sheryl B. Galler, Esq., dated July 5, 2002 ("Galler Affirm."), Ex. C at 1).

Pursuant to the 2000 Letter, Eschelbach therefore was to be paid in two installments (1.5% of operating income as part of his 2000 bonus and 1.4% [2.9% - 1.5%] of operating income as part of his 2001 bonus) for deals, such as the Merck transaction, that closed in the second half of 2000, but prior to December 15, 2000. For deals that

closed in the first half of 2000, Eschelbach was to receive the entire 2.9% as part of his 2000 bonus.[3]

It is undisputed that the deals involving Merck and Hewlett-Packard were "redone" in the second half of 2000 for tax reasons. (See Order at 17; Feb. 23, 2006 Tr. ("Tr.") at 23). While this generated no _new_ operating income, Eschelbach takes the position that CCF would not have earned any income had the deals not been restructured. (Tr. at 18-19). For this reason, he views the restructured deals as "new" deals entitling him to additional bonus compensation. (Id. at 25-26). In an effort to buttress this view, he cites an earlier transaction in 1999 involving Deutsche Bank, in which CCF allegedly paid his team members a second bonus "when [they] had to redo a transaction" because management "didn't want to have a disincentive for people to redo transactions." (Dep. of Karl Eschelbach, taken on Nov. 20, 2001 ("Eschelbach Dep."), at 69-70). CCF counters that Eschelbach is not entitled to any further bonus payments because a restructured deal cannot be considered a "new" deal. (CCF Reconsid. Mem. at 3-4).

My prior Order concluded that, "[w]hile CCF appears to have the more reasonable interpretation of the term 'new deals,' the Court cannot say, as a matter of law, that a restructured deal could not be a 'new deal' within the meaning of the 2000 Letter." (Order at 17). For this reason, CCF's motion for partial summary judgment on Eschelbach's contract claim was denied. (Id.).

---

[3]     The 2000 Letter also capped Eschelbach's 2000 bonus at $330,000. (Id.).

In its motion for reconsideration, and more particularly during oral argument, CCF changed its focus slightly, arguing, among other things, that Eschelbach received a bonus based on the value of the original failed deals and was entitled to no further consideration because no additional operating income was generated as a consequence of the restructurings.  (CCF Reconsid. Mem. at 4; Tr. 13).  Indeed, both sides agree that no new operating income resulted from the restructuring of the two deals at issue.  (See Tr. 13, 18).

Under the 2000 Letter, for Eschelbach to have earned a bonus on the original deals involving Merck and Hewlett-Packard, the operating income from those deals had to have been either "received, earned, or accrued" prior to December 31, 2000.  (Galler Affirm. Ex. C at 1) (emphasis added).  However, Eschelbach plainly was not entitled to a separate bonus as each of these events occurred.  For example, if Eschelbach received a bonus when the operating income on a deal accrued, he was not entitled to a second bonus when the accrued income actually was received.  Stated somewhat differently, Eschelbach could not double dip.

Similarly here, because Eschelbach was paid a bonus in connection with the Merck and Hewlett-Packard deals after one of the three triggering events occurred, he was not entitled to a further bonus when the deal was restructured because, even if the restructured deal could be characterized as a "new" deal, no new operating income was received, earned, or accrued.

The Merck transaction well illustrates this point. In an Appendix to the 2000 Letter, the parties described the Merck transaction as a $300 million deal, which was expected to generate $5.5 million in operating income. (Id. at 3). Eschelbach's bonus therefore should have been $159,500 ($5,500,000 x .029). This is precisely the amount that CCF eventually tendered to Eschelbach in 2001 as part of its severance check to him. (See Galler Affirm. Ex. P) (Letter from Frederic Newman, Esq., to M. Christine Carty, Esq., dated July 2, 2001). The 2000 Letter contains no language whatsoever suggesting that Eschelbach was entitled to be paid again simply because the original operating income subsequently was posted against a restructured deal.[4]

As noted earlier, in an effort to bolster his reading of the 2000 Letter, Eschelbach testified at his deposition that he received a second bonus in 1999 when his team restructured a deal involving Deutsche Bank. (Eschelbach Dep. at 69-70). There has been no showing, however, that this bonus was received under similar circumstances, much less that the parties intended to apply the same ground rules a year later, when they entered into the 2000 Letter. Moreover, even if that was their intent, it is a settled

---

[4]     The other transaction for which Eschelbach seeks a further bonus involved Hewlett-Packard. That transaction initially closed in February 2000, and Eschelbach was paid his bonus that year. (Eschelbach Dep. at 65, 67, 78). Since Eschelbach's argument with respect to the restructured Hewlett-Packard deal is the same as his argument with respect to the Merck deal, he faces the same stumbling block – namely, that no new operating income was generated when the restructuring occurred. Having received 2.9% of the operating income on the original Hewlett-Packard transaction as part of his 2000 bonus, Eschelbach has not shown, as he must, that the 2000 Letter required the payment of an additional bonus when the deal was restructured in a manner that did not cause CCF to receive, earn, or accrue any new operating income.

principle of New York law that parol evidence cannot be used to vary the terms of a contract unless a contract term is ambiguous. <u>767 Third Ave., LLC v. Orix Capital Mkts., LLC</u>, 812 N.Y.S.2d 8, 10 (1st Dep't 2006) (citing <u>South Ridge Assocs., LLC v. IBM Corp.</u>, 4 N.Y.3d 272, 278 (2005)). Here, assuming that the term "new deals" could be considered ambiguous, there still is no reasonable construction of the term "operating income" which would permit Eschelbach to be paid a second bonus, calculated as a percentage of that operating income, in circumstances where no additional operating income was received.

For this reason, upon reconsideration, CCF's motion for partial summary judgment on Eschelbach's contract claim is granted.

C.    <u>Labor Law Claim</u>

Eschelbach's eighth cause of action is brought under Sections 193 and 198 of the New York Labor Law. Section 193 prohibits an employer from making unauthorized deductions from the wages of an "employee." N.Y. Labor Law § 193(1) (McKinney 2002). Eschelbach's claim under this statute is essentially the same as his contract claim. It nevertheless is of considerable potential importance in this lawsuit because Section 198 of the Labor Law provides that a plaintiff who succeeds on a claim under Section 193(1) shall recover "attorney's fees and, upon a finding that the employer's failure to pay the wage required . . . was willful, an additional amount as

liquidated damages equal to twenty-five percent of the total amount of the wages found to be due."  N.Y. Labor Law § 198(1-a) (McKinney 2002).

There is a substantial division of authority as to whether someone employed in an executive, administrative, or managerial capacity, such as Eschelbach, can recover damages under Section 193(1) and, therefore, under Section 198.  The recent New York cases generally conclude that such supervisory personnel are precluded from securing relief under the provisions of Article 6 of the New York Labor Law.  See, e.g., Gottlieb v. Laub & Co., Inc., 82 N.Y.2d 457, 461 (1993) ("Except for manual workers, all other categories of employees entitled to statutory protection under Labor Law § 191 are limited by definitional exclusions of one form or another for employees serving in an executive, managerial or administrative capacity."); Davidson v. Regan Fund Mgmt. Ltd., 786 N.Y.S.2d 47, 49 (1st Dep't 2004) (precluding plaintiff, who was employed in an executive capacity, from bringing a claim under Labor Law § 198); Nornberg v. Thai Magic Co., No. 50104U, slip op. at *3-*4 (N.Y. Sup. Ct. Jan. 27, 2006) (collecting cases).

Certain federal decisions reach the same result.  See Rice v. Scudder Kemper Inv., Inc., No. 01 Civ 7078 (RLC), 2003 WL 21961010, at *3-*4 (S.D.N.Y. Aug. 14, 2003) ("plaintiff's status as an executive leads the court to conclude that plaintiff cannot state a claim for lost wages under [A]rticle 6"); Kaplan v. Aspen Knolls Corp., 290 F. Supp. 2d 335, 340 (E.D.N.Y. 2003) ("employees serving in an executive capacity are excluded from the protection of Labor Law Article 6"); Craven v. Verify Med. Inc., No. 99

Civ. 6091 (HB), 2001 WL 1729729, at *2 (S.D.N.Y. Dec. 5, 2001) (citing Gottlieb);

DeLeonardis v. Credit Agricole Indosuez, No. 00 Civ. 0138 (HB), 2000 WL 1718543, at

*11 (S.D.N.Y. Nov. 15, 2000) (vice-president of a bank who qualified as a professional

employee "[could not] take advantage of Section 198").

      Nonetheless, in Miteva v. Third Point Mgmt. Co., 323 F. Supp. 2d 573

(S.D.N.Y. 2004), after an exhaustive analysis of Article 6 of the Labor Law, of which

Section 193(1) is a part, and the case law interpreting its provisions, Judge Marrero

concluded that an analyst who allegedly had been promised a bonus of $650,000, but was

terminated four days before it was due, could maintain a claim under Sections 193(1) and

198.  Id. at 577, 585.  None of the other state or federal cases addressing the reach of

Article 6 of the Labor Law contains as detailed – or as persuasive – a discussion of the

statutory language.  Accordingly, relying on both Miteva and Judge Patterson's more

recent decision in  Pachter v. Bernard Hodes Group, Inc., No. 03 Civ. 10239 (RPP), 2005

WL 2063838, at *3-*4 (S.D.N.Y. Aug. 25, 2005), which followed Miteva, I concluded

that Eschelbach could pursue certain of his Labor Law claims.  (Order at 30).

      In the Order, although I discussed Miteva, I did not expressly acknowledge

the many cases cited therein that reached a different result.  For this reason, CCF seeks

reconsideration of my earlier decision.  Given the prospect of an award of damages under

Section 198, it is understandable that CCF would want some assurance that a significant

body of case law favorable to its position was not overlooked.

I was fully aware of the extensive New York case law disagreeing with Judge Marrero's conclusion at the time my Order was entered. Indeed, many of those cases are cited and discussed in <u>Miteva</u>. Accordingly, in ordinary circumstances, CCF's motion for reconsideration would probably have to be denied because I had, in fact, considered the decisions that counsel believes I overlooked. <u>See</u> Local Civil Rule 6.3 (party seeking reconsideration must set forth "concisely the matters or controlling decisions which counsel believes the court has overlooked"); <u>In re Integrated Res. Real Estate Ltd. Partnerships Secs. Litig.</u>, 850 F.Supp. 1105, 1151 (S.D.N.Y. 1993) ("Local Rule [6.3] is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court.").

In this case, however, I have now determined as a matter of law that Eschelbach cannot prevail on his contract claim that he is entitled to a further bonus. It follows that even if a bonus constitutes wages within the meaning of Article 6 of the Labor Law, and even if Eschelbach is not expressly exempted from its coverage, CCF is entitled to summary judgment on Eschelbach's eighth cause of action because he has received the full amount of the bonus that he was owed. For that reason, Eschelbach's Labor Law claim is dismissed.

III.    <u>Summary Judgment</u>

A.    <u>Applicable Standard</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. See Kulak v. City of New York, 88 F.3d 63, 70 (2d Cir. 1996). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court. Fischl, 128 F.3d at 55. See also Fed. R. Civ. P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." Fischl, 128 F.3d at 55.

To defeat a motion for summary judgment, the non-moving party cannot merely rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986). Rather, the nonmoving party must offer "concrete

evidence from which a reasonable juror could return a verdict in his favor." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

    B.    Discussion

        Eschelbach's fifth and sixth causes of action allege that CCF discriminated

against him on the basis of national origin in violation of the New York State and New

York City Human Rights Laws, N.Y. Exec. Law § 296 (McKinney 2005); N.Y.C.

Admin. Code § 8-801, et seq. The crux of these claims is not that he was terminated

improperly, but that CCF had entered into certain contracts with its French employees

which protected them from termination, without affording him the same guaranty of job

security. (See Order at 24; Docket No. 45 at 14) ("Eschelbach SJM Mem.").

        In its partial summary judgment motion, CCF took issue with Eschelbach's

assertion that its contracts with its French employees in the United States protected them

from termination in the event of a takeover. (See Order at 25) (citing CCF PSJ Reply

Mem. at 8). Now however, in connection with its present summary judgment motion,

CCF has put before the Court a series of agreements which show that Eschelbach's

contention was accurate. Specifically, CCF entered into secondment agreements with four

of its five French employees which CCF admits contained "an assurance that should the

secondee's position terminate other than for cause, CCF headquarters would attempt to

locate a position for the secondee in France."[5]  (Docket No. 40 at 27) ("CCF SJM Mem.").

CCF maintains that the additional protections that CCF afforded its expatriate employees

were granted to them on the basis of their French citizenship, not their national origin, i.e.,

where they may have been born.  (Id. at 7).  On this basis, CCF argues that Eschelbach's

State Human Rights Law claim must be dismissed because that statute, "like Title VII,

does not elevate citizenship to protected status."  (Id.).  CCF further asserts that

Eschelbach's New York City Human Rights Law claim is barred by the Supremacy

Clause of the United States Constitution because there is a bilateral treaty between the

United States and France which expressly permits CCF to treat its French expatriate

executives more favorably.  (See id. at 10-12) (discussing Convention of Establishment

between the United States and France ("Convention"), Nov. 25, 1959, 11 U.S.T. 2398).

 CCF's contentions raise several factual questions.  For example, to prevail

on the basis of its state law argument, CCF would have to show that it was citizenship, not

national origin, that motivated CCF to provide special benefits to certain of its French

employees.  This would require inquiry into CCF's intent, a traditional basis for denying

summary judgment.  See Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219,

1224 (2d Cir. 1994) (cautioning that summary judgment is often inappropriate in cases

where the trier of fact will have to delve into an employer's intent).

---

[5] Arthur Blot-LeFevre ("Blot-LeFevre"), the fifth French employee at CCF's New York branch, was a participant in a special program sponsored by the French Goverment.  (Decl. of Gerard Husson, dated Mar. 6, 2006 ("Husson Decl."), ¶ 10).  Despite his citizenship, Blot Le-Fevre was not retained by HSBC after the merger.  (Id.).

14

Similarly, to prevail on the basis of the Convention, CCF would, at a minimum, have to show that the preferential treatment extended to its French employees was "reasonably necessary to the successful operation of its business." Avigliano v. Sumitomo Shoji Am., Inc., 638 F.2d 552, 559 (2d Cir. 1981), rev'd on other grounds, 457 U.S. 176 (1982); see also Convention Art. 6, § 1 (companies in either signatory country may employ personnel in the other country who "by reason of their special capabilities are essential to the functioning of the enterprise"). This, too, appears to be a fact question.

Before there is any need to address such issues, to establish a prima facie disparate treatment claim, Eschelbach would be required to show that the comparator CCF employees faced "a situation sufficiently similar to [his] to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001) (citing Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir.1997)). Nonetheless, those other employees need not be identically situated. Instead, "it is sufficient that the employee[s] to whom plaintiff points be similarly situated in all material respects." McGuinness, 263 F.3d at 54.

There can be no question that certain French employees were treated differently. In fact, four of the five French nationals that CCF employed in the United States during the period of Eschelbach's employment were granted job security. In particular, each of their secondment agreements contained a section captioned "Return to France," which promised that they would be

> reintegrated within the Crédit Commercial de France hierarchy
> or in one of the Group's Companies in France, to a position
> that [CCF was] currently unable to specify, but that will
> correspond to the level of responsibility that you will have
> reached at the time you are repatriated.

(See Affirm. of M. Christine Carty, Esq., dated Mar. 10, 2006 ("Carty Affirm."), Ex. G at

4; see also id. Exs. H at 4, I at 4).

This was not the only distinction between the French CCF employees in the

New York branch and Eschelbach. Among other things, the French employees were

assured that they would receive, as part of their "transfer salary," the sums necessary to

continue their French retirement pensions, social insurance, and unemployment insurance.

(Id. Exs. G at 2, H at 2, I at 2). Additionally, they each were promised that they would

enjoy the same stock options and profit sharing that they would have had if they had

remained in France. (Id. Exs. G at 3, H at 3, I at 3). They also were compensated for the

cost of moving to the United States and returning to France at the end of their temporary

tours. (Id.). At least one of the employees (Jean Paul Foity, the CCF New York branch

manager) was assured that he would be reimbursed for "school tuitions, travel expenses

and lodging." (Carty Affirm. Ex. H at 3). Another employee, Fabrice van Moere, was

reimbursed for the cost of returning to France for his annual vacation. (Id. Ex. I at 4).

Eschelbach apparently was given none of these benefits.

Notwithstanding these differences, Eschelbach must show that he was

similarly situated. In an effort to do so, Eschelbach engages in a lengthy discussion of the

prior employment history and job responsibilities of each of the French employees with whom he worked at CCF's New York branch. (See Decl. of Karl Eschelbach, dated Mar. 31, 2006 ("Eschelbach Decl."), ¶¶ 9-31; Eschelbach SJM Mem. at 13-15). Eschelbach alleges that he was at least equal to two of the four comparator employees and therefore "deserved" the same protections that they were given. (Eschelbach SJM Mem. at 14; Eschelbach Decl. ¶¶ 33-38). He also suggests that he was more senior than the other two comparators and therefore "might have been expected" to have employment terms which were "more favorable . . ., not less favorable. (Eschelbach SJM Mem. at 14; Eschelbach Decl. ¶¶ 39-43).

Even if Eschelbach was an extraordinarily valuable employee, the evidence still compels the conclusion that he and the French employees assigned to the New York branch office were not similarly situated. At the outset, the comparator employees had been asked to leave countries where they were then working to accept a temporary assignment in the United States. Their secondment agreements dealt with the issues created by these international transfers, such as the need to continue their French pension coverage, in a manner which differed not only from CCF's treatment of its other United States employees, but also from its treatment of its other employees in France. (See Husson Decl. ¶¶ 4-7). Eschelbach, by comparison, had not been asked to move to a foreign country, did not face a potential differential in benefits as a result of an

international transfer, and did not have a job which was intended to be temporary at the time that it was offered to him.

Additionally, a CCF expatriate employee working in the New York branch who was terminated for reasons other than cause might find himself, through no fault of his own, in the United States without a job and with no assurance of employment in his home country. Without a promise of continued employment, such an employee also might find that he was ineligible for French unemployment benefits if he chose to return to France. (Id. ¶ 9). On the other hand, in the event that he was terminated by CCF, Eschelbach did not face the spectre of trying to find a new job while he was thousands of miles from home. He also would not have needed to repatriate himself since he was already living in his native country. Unless he was terminated for cause, Eschelbach presumably also would have been eligible for unemployment benefits on the same basis as his fellow countrymen.

CCF also alleges that if it had not provided benefits such as job security for its seconded employees, they would not have agreed to be assigned overseas. (Id.). The record contains no evidence that Eschelbach, by comparison, ever asked to be assigned overseas or that he needed a similar incentive to join or remain in CCF's New York branch. In fact, when he learned that CCF might be taken over by another entity, Eschelbach negotiated an agreement with CCF which indicated only what his bonus formula would be in the short term.

For all of these reasons, even if Eschelbach were able to establish that he was as valuable to CCF as some of his French colleagues, he and they were not similarly situated with respect to the need for continuing job security. Accordingly, his claims under the New York State and New York City Human Rights Laws must be dismissed for failure to make out a <u>prima facie</u> case of disparate treatment.[6]

---

[6]     Eschelbach's motion papers also raise two procedural objections to the granting of summary judgment to CCF. First, he alleges that CCF should not have been permitted to spread its summary judgment arguments over two motions. (Eschelbach SJM Mem. at 17-18). Second, he notes that CCF originally sought permission to file a second summary judgment motion for the limited purpose of arguing "that Eschelbach's claims purportedly constitute citizenship discrimination and that the French Treaty purportedly bars such claims." (<u>Id.</u> at 18). He argues that it is therefore improper for CCF to attack the adequacy of his <u>prima facie</u> case. (<u>Id.</u> at 12-13). Nonetheless, even if these objections had merit, little purpose would be served by denying CCF's summary judgment motion and permitting this case to go to trial since the evidence establishes that, pursuant to Rule 50 of the Federal Rules of Civil Procedure, CCF would be entitled to judgment as a matter of law at the close of Eschelbach's case.

IV.   Conclusion

For the foregoing reasons, the fifth, sixth and eighth causes of action in Eschelbach's amended complaint are dismissed, as is his first cause of action to the extent that he seeks further bonus payments. These rulings dispose of CCF's motion for reconsideration (Docket Nos. 32-33) and its motion for summary judgment (Docket Nos. 39-41).

Because CCF sought only partial summary judgment on Eschelbach's contract claim, it appears that he may be able to proceed with some limited aspect of his first cause of action. To determine whether this is necessary, the Court will hold a further pretrial conference at 11 a.m. on August 18, 2006, in Courtroom 20-A. If this is not a convenient date and time, counsel should place a conference call to my Chambers to make other arrangements.

SO ORDERED.

Dated:     New York, New York
           July 25, 2006

                                        /s/ FRANK MAAS
                                        FRANK MAAS
                                        United States Magistrate Judge

---

"(...continued)
CCF's summary judgment motion and permitting this case to go to trial since the evidence establishes that, pursuant to Rule 50 of the Federal Rules of Civil Procedure, CCF would be entitled to judgment as a matter of law at the close of Eschelbach's case.

Copies via fax to:

Sheryl B. Galler, Esq.
Hoguet, Newman & Regal, LLP
10 East 40th Street
New York, New York  10016
(212) 689-5101 (fax)

M. Christine Carty, Esq.
Schnader, Harrison, Segal & Lewis, LLP
140 Broadway, Suite 3100
New York, New York  10005
(212) 972-8798 (fax)